865

Rafael Colón et al., Plaintiffs and Appellants, v. Central Cambalache, Inc., Defendant and Appellee.

No. 5808.   Argued March 13, 1934.—Decided July 19, 1935.

Lens & Susoni for appellants.   Félix Santoni for appellee.

Mr. Justice Wolf delivered the opinion of the court.

For the purposes of this appeal we may make an extract of some of the facts found by the court below as follows:

"This is an action of denial of servitude begun by Rafael and Amado-Bernardo Colón against Central Cambalache, Inc. In the complaint the plaintiffs allege that they are owners of a piece of land situated in the jurisdiction of Arecibo, consisting of 3.70 acres which they acquired by purchase from Carmelo J. Colón, free of encumbrances, and that the defendant, without the consent of the complainants nor of the persons who preceded them in the ownership of the land, and without compensation, has extended over said lot iron tracks of a private railroad that belongs to it which runs over a piece of land on the property of the plaintiffs with a width of three meters and crosses it from east to west, and that in spite of the requests that the plaintiffs have made to the defendant, the latter has refused to remove said track.

"An amended complaint was answered by the defendant denying all of the averments of the same and as special defenses set up as follows:

"A. That Clara Alvarez, known also as Sagastibelza, erected a servitude of a perpetual right of way in favor of Central Cambalache, Inc., for value received so that the defendant might lay down its rails and move its trains, such servitude being impressed upon a private piece of property of the said Clara Álvarez containing 129.25 acres located in the wards of Hato Abajo and Hato Arriba of Arecibo.

"B. That the property of 3.70 acres which the complainants claim is bound on the south by lands of the heirs of Clara Sagastibelza, known also as Álvarez, being a part of the lot of 129.25 acres.

"C. That Clara Sagastibelza or Álvarez died and that her heirs were Saturnina Álvarez or Sagastibelza and Carmelo, Rafael and Amado Colón, and that the three last named were the assignees of the estate; that the property of 129.25 acres actually belonged to the said three persons.

"D. That Sebastián Figueroa, husband of Clara Álvarez, granted another perpetual easement for value received in favor of the defendant on a piece of property of 208 acres situated in the ward of Hato Abajo of Arecibo.

"E. That Sebastián Figueroa died and left as his heirs his wife, Clara Álvarez and she was succeeded by Carmelo, Rafael and Amado Colón."

"F" related to the record of the properties and its transcription may be omitted.

"G. That both the property of 129.25 and 208 acres are bounded on the north by a property that belonged to Eduardo Rosso, acquired later by Carmelo J. Colón, who carved out of it 3.70 acres and sold them to his brothers Rafael and Amado Colón (the plaintiffs).

"H" refers to "F" and may be likewise omitted.

"I" is as follows:

"That Carmelo J. Colón and his brothers Rafael and Amado Colón knew of the existence of the servitudes which encumbered the lots of 129.25 and 208 acres and knew that they were granted by Sebastián Figueroa and Clara Álvarez.

"J. That the brothers Colón by knowing of these servitudes and by the fact that they could observe the rails extended by the defendant

fourteen years before and the trains that were being operated were not third persons and that they acquired the property from their predecessors knowing of the existence of said servitudes.

"K. That the brothers Colón have obtained the benefit from the road extended by the defendant loading and transporting the cane belonging to them.

"L. That the defendant constructed the road in good faith spending many thousand of dollars on it and making it permanent without any opposition from the complainants or of any other person.

"M. That the brothers Colón have performed acts that bear with them the acknowledgment and acceptation of said servitudes.

"N. That if the railroad does pass over the land described in the complaint, this was due to the fact that the Colón brothers, being proprietors of the neighboring lands, have caused some mix up or confusion with the object of making such fact appear."

After this review of the pleadings and tracing the history of the title, the court, copying from the complaint, describes the property of the plaintiffs as follows:

" 'RURAL: composed of 3.70 acres of level sugar-cane land bounded on the north by Luisa Colón, separated by a river named Villanueva; on the south by Clara Sagastibelza; on the east by the Santiago River; and on the west by the principal property from which it is segregated, property of Carmelo J. Colón Sagastibelza.'

"That the said property was recorded without encumbrances in the registry of property."

Then the court traces the origin of the property of 37.95 acres from which the parcel of 3.70 acres was carved out. The court describes the origin of the other lands and their boundaries. More particularly it appears that the property of 129.25 acres had a small house described close to its northern boundary. The court also resumes the evidence somewhat tending to show an estoppel in the plaintiffs from asking that the rails should be removed. Then, after other statements, the court goes on to say:

"With respect to whether the rails laid down by the Central Cambalache, Inc., traverse the land of 3.70 acres as the plaintiffs allege, or is within the property of 129.25 acres, as the defendant alleges, the proof is contradictory.

"In reality, this is the only question to be decided in this case. It is a material (tangible) question, and, therefore, the court took a view of the spot in question, making the corresponding memorial (*acta*) in which the conclusions of the court are set forth.

"If this were a question of locating a right of way on a piece of property whose boundaries were duly fixed and set forth and surrounded by properties belonging to persons alien to the complainants, the question to decide would be relatively easy. . . . But in this case we are up against a truly difficult and unusual situation, inasmuch as all the land bordering the property of 3.70 acres of the complainants also belongs to them and as it is clear that all the land belongs to the same proprietors it lacks apparent signs which would determine and fix the respective boundaries of each one. . . ."

The court entered into other considerations to which we shall refer hereafter. Judgment was rendered for the defendant.

██ On appeal, among others, the appellants allege the following assignment of error:

"1. That the District Court of Arecibo erred in not giving weight and credit to the testimony, oral and expert, that the road of the defendant is located on the property of the plaintiffs, the object of the action in denial of servitude."

At the outset of the discussion of the first error the appellants truly say that in an action for the denial of an easement the complainant is only obliged to prove his title and the material acts by which the defendant encumbers or obstructs the right of the plaintiff; that it is incumbent on the defendant to prove the existence of the servitudes and that this was one of the few cases where the burden of proof falls upon the defendant. After other considerations, the plaintiffs say that—

"Instead of denying in a clear and specific form that on the land of the complainants there was no road whatsoever of the defendant, or that one existed with a just title, the Central denied in a general form the facts of the complaint and afterwards, in a certain way contradictory, alleged that other persons, who are not parties to the action, had granted them rights of way on two properties, completely

distinct in area and boundaries from the ones described in the complaint; and that if the said rails cross the property of the complainants, the object of this action, it would be by their confusion and mixing up owing to the condition of the land."

A little ahead of this the plaintiffs say that the special defenses tended to introduce confusion into the case.

Necessarily we agree that once a plaintiff has proved his title, the burden is on the defendant to show an easement or right of way. However, the burden is primarily on the plaintiff to show his title. In the present case the controversy reduced itself to whether the rails were placed to the north or to the south of the boundary of the property of 129.25 acres. The burden fell clearly on the plaintiffs themselves to show where the southern boundary of the parcel of 3.70 acres lay. All the facts of the complaint were denied. The defendant certainly did not admit that the southern boundary of the 3.70 acres lay where the plaintiffs said it did.

We quoted from the opinion of the court to show that exactly where this southern boundary of the plaintiffs lay was the real controversy in the case. Primarily this was almost the only question in issue.

We have not been able to find any case that clearly says that where a private right of way of a private railroad has been laid down and a plaintiff claims that it is on his land, the burden is upon him to show the boundaries thereof. This would seem to be the ordinary rule, practically conceded by the plaintiffs. We have, however, found a number of cases where it was shown that a plaintiff could have resource to ejectment as against a railroad company in possession of land and rails. *Dodd* v. *St. Louis & H. Ry. Co.*, 18 S.W. 1117; *Pittsburgh, V. & C. Ry. Co.* v. *Oliver et al.*, 19 Atl. 47; *Dulin* v. *Ohio River R. Co.*, 73 W. Va. 166, 80 S.E. 145, Ann. Cas. 1916D, 1183; *Hill* v. *Woodward*, 100 Miss. 879, 57 So. 294, Ann. Cas. 1914A, 390.

We also quoted from the opinion of the court to show how difficult had been the question of fact in this case. The

finding of the court was that there were no material marks or natural boundaries from which this southern end of the property of the plaintiffs could be definitely located.

At both the hearing and the rehearing of this case we were in doubt as to whether the plaintiffs had not made out a case for reversal, but in the various times that we have considered the facts, we reached no definite conclusion in opposition to the finding of the court below.

The strongest thing in favor of the plaintiffs was that in the description of the property of 129.25 acres the scrivener said that a small house was located on the northern boundary of the said property. At least three witnesses of the plaintiffs testified to the present existence of that house and that it lay well to the south of the rails laid down by the defendant, but one of them was the surveyor whose testimony was not clearly first hand. It should be interposed that at the time that the rails were laid down, the defendant, Central Cambalache, was as lessee in possession of practically all the land in controversy and hence it should have been easy for it to make a mistake in locating the rails.

The court said:

"One thing, however, which most specially attracted the attention of the judge when taking the view was the *stake* placed at the very corner formed by the Tanque road and the remainder of the parcel of Rosso or of the plaintiffs. The judge also could not help noticing that although in the deed of segregation and sale of the 3.70 acre parcel it was stated that it was bounded on the west by the main tract from which it had been segregated, it is a fact that the said parcel and the main tract are separated by the Tanque road which is more than three meters wide. Why was not the Tanque public road given as the west boundary of the parcel in controversy instead of the main tract from which it had been segregated?

"There is another circumstance greatly deserving our consideration in deciding this case. If it is admitted that the 3.70 acre parcel was bounded on the south by the 129.25 acre tract, as claimed by the plaintiffs, that is, further south from the tracks, the result would be that both the tract formerly belonging to Rosso, along its whole length, and the small 3.70 acre parcel, subsequently segregated, would

not only be bounded on the west by the main tract, but would also be bounded on the west partly by the 208 acre tract, once belonging to Luisa W. de Juarbe, then to Sebastián Figueroa and now to the plaintiffs, inasmuch as the parcel in controversy would be like a wedge between the 208 acre tract and the Santiago River as far as its south boundary with the 129.25 acre tract. That is not so, because neither in the old description of the tract sold by Rosso to Carmelo J. Colón and by the latter to his other brothers, nor in that of the 3.70 acre parcel, made when it was segregated from the main tract, is the south boundary des'gnated as having the shape of a wedge between the Tanque road and the Santiago River; rather, the south boundary is designated as a straight line.

"On the other hand, in the description of the 129.25 acre tract, over which the right of way was constituted by its owner Clara Alvarez or Sagastibelza in favor of defendant Central Cambalache, Inc., it is stated that the same is bounded on the north by land of Eduardo Rosso instead of Rosario Álvarez, by land of Luisa Waterson and by a country road which leads from Tanque to Dominguito. This country road from Tanque to Dominguito runs along the whole length of the west boundary of the 129.25 acre tract and on reaching the location of the *stake,* that is, at the angle of the road with the tract of Rosso, it turns slightly to the right or east, which shows that the said parcel is bounded on the north by the aforesaid road. But if we admitted the boundaries of the said tract such as the plaintiffs claim them to be, the result would be that instead of being bounded on the north by the said road, by land of Luisa Waterson and of Eduardo Rosso, it would only adjoin land of Luisa Waterson and of Eduardo Rosso but not part of the road.

"\* \* \* \* \* \* \*

"Among the maps introduced in evidence in this case, the only ones relied on by the court are the two old ones which refer, one of them, to the tract of Luisa Waterson de Juarbe, afterwards of Sebastián Figueroa, measuring 208 acres, drawn by surveyor B. M. Martínez Mora in 1903, and the other is the plat of the 129.25 acre tract, known as El Tanque, late of Clara Álvarez or Sagastibelza, now of the plaintiffs, drawn by surveyor Arturo Puig in 1909. The map drawn on December 4, 1930, by the same surveyor Arturo Puig has not been relied upon by the judge for several reasons, one of which being that the judge, being well posted in surveying because he was a surveyor by profession before he took up law, knows quite well that a map drawn on such false data as was the one to which

we refer, has serious defects, since it is based on information furnished by the interested parties themselves; another reason is that the survey of the 3.70 acre parcel was made and the map of the same was drawn without any intervention whatever on the part of the defendant, not even for the purpose of indicating the corners existing at the time of the laying of its track; and a third reason is that, because of the absence of visible, apparent and permanent signs of the south boundary of the 3.70 acre parcel adjoining the 129.25 tract, and specially because both tracts are the property of the plaintiffs, it is easy to make mistakes in ascertaining the true boundaries, specially in the absence of permanent signs thereof.

"From the view taken, the court has reached the conclusion that the true south boundary of the 3.70 parcel is the one indicated by the boundary line between the 208 acre tract and the Rosso tract, which is marked on the map of December 4, 1930, N. 75° 0″, prolonged towards the east and passing by the *stake* until it reaches the bank of the Santiago ditch. As this is the true south boundary of the said parcel contiguous to the 129.25 tract, there results that the track lies to the south of the said boundary line, that is, within the 129.25 tract, late of Clara Álvarez or Sagastibelza and now of the plaintiffs. As the said Clara Álvarez or Sagastibelza granted a right of way to the defendant for the laying of the said track, which right of way was recorded in the name of the Central Cambalache Inc., in the registry of property, it is as clear as daylight that the plaintiffs have no right at all to deny the perpetual servitude granted by their predecessor in interest for a consideration. The place over which was laid the track that crosses the parcel of Clara Álvarez or Sagastibelza and enters that of Sebastián Figueroa has undergone changes in the course of years. Its topography is rather changed. This could be noticed when taking the view. It was necessary, when laying the said track, to somewhat level a hillock half circular in shape which was part of the tract of Sebastián Figueroa near the Tanque road. It was to be expected that the place in question should undergo a change in appearance and contour by reason of the leveling to make the roadbed.

"In spite of that, the court has no doubt that the true boundary line of the 3.70 acre parcel adjoining the 129.25 acre tract is the one we have mentioned, that is, to the north of the track."

Necessarily, if the house is still located on the spot where the plaintiffs' witnesses said it was, and this was the actual

southern boundary of the land of the plaintiffs, they would be right. This evidence, however, is inconsistent with the other considerations entered into by the court. It would seem impossible to us, as to the court below, that the western boundary of the plaintiffs' land should have been described as bordering only on the property of Rosso when its actual location would leave a fairly wide piece of land abutting to the west on the 208 acres that clearly belonged to Figueroa, and subsequently to his wife.

We are not at all satisfied of the exact location of the house to which the witnesses refer. There is also a possibility that the house that they now find on the land might not have been the house that existed on the northern boundary. It is very easy on any property to put up small houses. As the judge points out when he made his view, the whole property was so covered with cane or otherwise, that it was difficult to find marks of any kind.

In its finding on the view, the court did not at all refer to the existence of this house located on the property of 129.25 acres, but the plaintiffs moved later to have the view corrected. The court nominally said that it would make no correction of its view, as no such correction had been asked before the judgment, and that the judgment ought to stand. In other words, this correction was asked at the time that the parties were preparing their record on appeal. The court then said that at the time of the view, its attention was not particularly drawn to this house and that at the trial it had given the house no importance.

The court, as we have seen, shows or attempts to show that the southern boundary of the property of 37.95 acres from which the plaintiffs' property was carved, followed practically a straight line which would run to the north of the railroad tracks. The plaintiffs answer this by saying that the boundary of the property of 37.95 acres did not run in a perfectly straight line.

We have not entered into a much greater analysis, because we feel ourselves bound by the conclusion at which the court arrived and we have not been convinced by the appellants to the contrary.

The second assignment of error may be said is covered by the foregoing considerations. A map offered by the plaintiffs to show the location of the plaintiffs' land was admitted. The court, however, held in effect that it gave it no great weight, because the plat was prepared at the instance of the plaintiffs alone without any intervention of the defendant, that the court thought that a plat so prepared had no great weight and necessarily the judge, who had also been a surveyor, was in a better position to judge the real facts of the case. The plat, of course, was admissible to give the court and the defendant an idea of what the claim of the plaintiffs was, and for other similar purposes.

Error is assigned in not admitting the map showing the boundaries of the 129.25 acres offered by the plaintiffs in the case in chief. We do not think that plaintiffs made a due offer. Moreover, the court subsequently admitted this map in rebuttal.

The plaintiffs say that if said plat had been admitted they would have offered another plat of the 208 acres which the court subsequently refused to admit on the theory that it should have been offered on direct examination.

We rather think that before the close of the trial the plaintiffs ought to have presented this class of argument to the court and perhaps the court then would have yielded to it. We have, however, looked at the map of the 208 acres and the plaintiffs do not show us how its refusal hurt their case. This covers also the fourth assignment of error.

The other questions raised, we think, would be sufficiently covered by the following considerations. The defendant attempted to set up estoppels of various kinds. We think under the doctrine of *Torres et al.* v. *Plazuela Sugar Co.,* 24 P.R.R. 451, that a good deal would be required to estop the

plaintiffs if they had primarily a case of denial of a servitude. When these rails were put down the Central Cambalache apparently was in possession of all the land. Neither the plaintiffs nor their brother did anything directly to consent to the rails being put down and the evidence does not convince us that any of the Colón brothers had any direct knowledge that the rails were being located by the Central Cambalache on the 3.70 acres.

In point of fact the court did not, we think, rely on any matter of estoppel to found its judgment but made running commentaries on the fact that the plaintiffs knew about the existence of the right of way and the like.

The judgment appealed from will be affirmed.